### HEADRICK v. FAIR et al.

### No. 1598.

Court of Civil Appeals of Texas. Eastland.

Nov. 13, 1936.

Barker & Cornelius, of Sweetwater, for appellant.

P. Edward Ponder and Jas. H. Beall, Jr., both of Sweetwater, for appellees.

GRISSOM, Justice.

Chas. D. and R. L. Blakey, hereinafter called Blakey Brothers, were engaged in the ranch business in New Mexico. In October, 1934, they executed a mortgage to Lea County Agricultural Credit Corporation to secure the payment of a note for $3,000, and additional advances to the extent of $1,000. This mortgage covered the cattle here involved as well as others. The mortgage was properly recorded in New Mexico the day after its execution. About January 6, 1935, appellant Headrick went to Blakey Brothers' ranch in New Mexico and, according to his contention, purchased 150 yearling steers from them, including the 120 head here involved. Appellant alleged that about March 6, 1935, Blakey Brothers wrongfully sold 120 head of the cattle which he claims to have so purchased to Ed Fair of Kansas. Blakey Brothers did sell and deliver to Fair at Karnegay Switch in New Mexico 170 head of cattle on March 5, 1935. Fair shipped the cattle by railway from said point to himself at Alden, Kan. The cattle were routed through Sweetwater, Tex. When the cattle arrived at Sweetwater, appellant filed suit there against Fair, alleging that appellant was the owner of and entitled to the possession of 120 head of the cattle then in Fair's possession. He had a writ of sequestration levied upon said 120 head of cattle and they, under orders of the court, were sold and the proceeds held by the clerk of the court pending further orders. Thereafter appellant amended his petition and made Blakey Brothers parties defendant. He alleged a written contract with them for the sale of 150 head of steers and that he had delivered his check to Blakey Brothers for $350 in part payment for same; that the cattle were to be delivered between May 1 and May 15, 1935; that Blakey Brothers wrongfully sold said steers to Fair and he alleged the seizure and sale and deposit of proceeds in court. Appellant alleged that he had agreed to pay Blakey Brothers $2,182.50 for the cattle seized and sold, that appellant was entitled to judgment for $1,105.33, to be paid to him out of the proceeds deposited in the registry of the court; that Blakey Brothers were entitled to receive $1,949.67 from such sale, being the purchase price of the cattle seized, less court costs. Appellant prayed for a specific performance of his alleged contract with Blakey Brothers. The Blakey Brothers were served with nonresident notices, but did not appear and answer.

Thereafter, Lea County Agricultural Credit Corporation intervened and sought

foreclosure of its mortgage. At the conclusion of the testimony, the court discharged the jury and entered judgment declaring the validity of intervener's debt and mortgage, and ordered the net proceeds of the sale of the 120 head of cattle paid to it. The judgment denied the appellant any recovery. It contained other recitals not necessary to mention, since Headrick alone has appealed.

Appellant testified, in substance, that, about January 5, 1935, he went to Blakey Brothers' ranch in New Mexico and met Chas. D. Blakey; that he negotiated with said Blakey for the purchase of some cattle; that he bought 150 head of Hereford steer yearlings at 5 cents a pound, to be delivered between May 1 and May 15, 1935, at Karnegay Switch stock pens, f. o. b., cars, with 10 per cent. cut allowed; that said Blakey agreed to keep the cattle until said time and take good care of them. He testified that he looked at about 100 head of such cattle with certain brands and marks, and that Blakey assured him that the remaining steers were of the same kind and quality. Appellant introduced on the trial of the case his check dated January 5, 1935, payable to Blakey Brothers for $350. On the reverse side of this check was written "Part payment on about 150 steers at 5 cents per pound, delivered at Karnegay stock pens, F. O. B. cars, overnight shrink. Delivery to be made May 1 to May 15th, 1935." Appellant testified that nothing was said in the trade "as to whether or not the title to the cattle was to pass * * * then or on some future date." No contention is made that appellant bought all of Blakey Brothers' yearling steer Herefords with certain marks and brands.

Under this situation, the question determinative of the case is whether taking that testimony most favorable to appellant and disregarding all testimony to the contrary, it shows, as a matter of law, that title to the cattle seized did not pass from Blakey Brothers to Headrick, prior to the sale to Fair.

The Supreme Court of Texas, in the early case of Cleveland v. Williams, 29 Tex. 204, 94 Am.Dec. 274, held in a case where possession remained with the seller, that title to personal property did not pass from the seller to the purchaser so long as anything remained to be done by the seller which was necessary in order to separate the property sold from the mass, bulk, or, as here, the herd, of which the property sold formed a part. The court further held that where such situation existed the purchaser could not maintain an action to recover the specific property alleged to have been purchased because the purchaser had no right in any specific part of the mass or herd. The court quoted from the opinion by the Supreme Court of New York in Crofoot v. Bennett, 2 N.Y.(2 Comst.) 258, 260, in part, as follows: "'But if a given number out of the whole are sold, no title is acquired by the purchaser until they are separated, and their identity thus ascertained and determined. The distinction in all these cases does not depend so much upon what is to be done, as upon the object which is to be effected by it. If that be specification, the property is not changed; if it be merely to ascertain the total value at designated rates, the change of title is effected.'" Also see Parlin & Orendorff Co. v. Kittrell (Tex.Civ.App.) 95 S.W. 703, 704; Goldberg v. Bussey et al. (Tex. Civ.App.) 47 S.W. 49; Minnick v. Dreyer Motor Co. (Tex.Civ.App.) 227 S.W. 365; McDougle et al. v. Pennington (Tex. Civ.App.) 194 S.W. 657; 55 C.J. § 537, p. 537; id. § 543, p. 541; § 544, p. 542; § 547, p. 544; § 553, p. 550; 37 Tex.Jur. § 202, p. 448, et seq.

It is evident from the testimony most favorable to appellant that under the contract asserted by him he could not have gone to Blakey Brothers' ranch and pointed out any particular cattle and said, "That is mine." The most he could have said would have been, "That is the kind of yearling of which I have bought about 150 to be taken out of Blakey Bros. herd of Hereford steer yearlings." Appellant had the right, he says, of a 10 per cent. "cut." Who had the title to the 10 per cent. he expected to cut back when delivery was made in May? Of course, he might waive this right, but the situation with reference to ascertainment or identification of particular cattle would not be materially changed. If waived, he simply would take the first 150 head of Hereford steer yearlings with certain marks and brands that Blakey Brothers delivered to him. The writing on the reverse side of his check called for "about 150 steers." Who was to determine whether it was to be exactly 150, or more, or less than 150, and who had the title to such cattle until the

exact number was ascertained? If it was meant that appellant was to get 150 head after exercising his right to cut 10 per cent., then Blakey Brothers must, at least, present about 167 head of the description mentioned so that appellant might select 150 head from the herd. Until the cut was made, who owned the 17 head to be rejected? We think it evident that title remained in Blakey Brothers.

Appellant, among other things, testified as follows:

"Q. If any of those cattle had died between May 1 and 15, you would not have paid for them? A. Well, of course, that is customary, he could have done something with a part of the cattle.

"Q. You never did intend to pay for any cattle that you did not receive at Karnegay stock pens? A. Yes, that was where I was to get them.

"Q. And you were going to pay for them according to the weights there? A. Yes sir.

"Q. Those cattle were going to be weighed? A. Yes sir.

"Q. And you were going to be entitled to 10 per cent cut? A. If I wanted 10.

"Q. You could have cut out of there— looked at those cattle and you could have cut 10 per cent back? A. I had that right.

"Q. And you weren't going to pay for any you didn't get? A. No that was the trade. I just bought so many cattle and so much cut.

"Q. In other words, if any of those cattle had died between that time and May 1st you wouldn't have paid for those cattle? A. No, I didn't buy any dead cattle.

"Q. You never did pick out the 150 head you bought? A. I think so, most of them.

"Q. Just as to class and kind? A. Yes sir, looked at most of them. * * *

"Q. I believe you testified awhile ago that you were only to pay for the cattle actually delivered to you? A. Sure, that is right."

It was the contention of Blakey Brothers who testified by deposition, that the contract for sale of any cattle by Chas. D. Blakey to appellant was conditioned upon approval of the deal by R. L. Blakey and by the intervener credit corporation. Discussion of such contention and the testimony relative thereto is unnecessary. However, the check given by appellant to Chas. D. Blakey on January 5, 1935, was soon thereafter returned, and appellant notified that the deal would not be consummated.

We consider the quoted testimony important, especially that portion of appellant's testimony wherein he said he would not have paid for any cattle that might have died prior to delivery. The question upon whom the loss will fall, in the event of death or destruction of the chattel before delivery, is an important consideration in determining when title passed, or when it was intended by the parties to the contract that title should pass. It is evident that if appellant was the owner, that is, had title to an ascertained or designated 150 head of cattle on the Blakey ranch prior to delivery thereof, then if one head, or all, of said cattle died before delivery, appellant, being the owner thereof, should suffer the loss and would be required to pay the agreed purchase price, though the cattle be never delivered to him. We conclude that the testimony most favorable to appellant's contention shows that there was never a designation of particular cattle distinguishing and setting them apart from the herd so that title passed to him. Therefore, title to the cattle seized by virtue of the writ of sequestration had not passed from Blakey Brothers to the appellant.

We think this necessary conclusion answers all of appellant's propositions. If he did not own the cattle seized (although he may have a cause of action for damages for breach of contract), he had no right to their possession, and his action in having 120 head seized was, under the law, wrongful, and he thereby acquired no rights in the cattle, and, consequently, no rights in and to the funds substituted therefor, after the sale of the cattle.

We are of the opinion that the intervener had a valid lien upon the cattle seized and that the evidence introduced to establish the same was not subject to the objection made. But, if this were not so, we doubt the right of the appellant (he, under the conclusion heretofore stated, having no title to the property here involved) to question the title or right of the other parties hereto to the cattle or their proceeds. If appellant was not entitled to receive the proceeds, it is immaterial, so far as he is concerned, whether

the other parties to the suit did or did not establish their legal right to such proceeds.

It necessarily results that appellant had no right to insist upon a marshaling of assets even if otherwise he would have been entitled thereto.

Appellant's assignments of error are overruled. The judgment of the district court is affirmed.